UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

MAYLA V. CAMPOS, *et al,*           §
                                    §
         Plaintiffs,                §
VS.                                 §     CIVIL ACTION NO. 5:12-CV-7
                                    §
WEBB COUNTY SHERIFF'S               §
DEPARTMENT, *et al,*                §
                                    §
         Defendants.                §

## MEMORANDUM AND ORDER

On January 18, 2012, Plaintiffs David Campos ("Campos") and Mayla V. Campos, individually and as next friend of David Campos, an incapacitated person, filed the instant action against Defendants Webb County Sheriff's Department and Webb County, Texas.[1]  Dkt. No. 1.

David Campos was allegedly sexually assaulted while in custody at Webb County Jail.  Plaintiffs bring suit under 42 U.S.C. § 1983, alleging violations of Campos's Eighth and Fourteenth Amendment rights.

On March 31, 2014, the Court held a hearing on pending motions and after careful consideration entered an order granting Defendant's Motion for Summary Judgment (Dkt. No. 76).  The Court now issues this Memorandum detailing the reasons for its decision.

### I.    BACKGROUND

On April 20, 2011, Campos was arrested for possession of marijuana greater than 5 pounds in a drug free zone.  Campos's booking and classification took place from

---

[1] Defendant Webb County Sheriff's Department was voluntarily dismissed from the suit on March 22, 2012, leaving only Webb County, Texas ("Defendant") as a defendant in this suit.  Dkt. No. 4.

the night of his arrest, April 20–21, 2011, through his final placement in the cell where the alleged sexual assault occurred, on April 25.  Prior to Campos's classification, three different officers and medical staffers completed a Screening Form for Suicide and Medical and Mental Impairments, an Admission Data Screening Form, a Booking Information Sheet, and a Medical Chart with observations from his medical screener.

For all of these forms, officers or medical staff asked Campos a series of questions and checked appropriate boxes based on his answers.  Some of these forms also provided the officer or medical staff's own observations of Campos.  On every one of these forms over a day-long period, Campos denied ever receiving services for mental health or mental retardation, having been in special education, and being treated for emotional/mental problems.  Jailers did not record any independent observation that he had borderline intelligence, with Officer Luis Lozano specifically noting "claims to be normal" on the Booking Information Sheet.[2]

 After the initial round of screening forms were completed, a medical staffer ran a continuity of care query ("CCQ"), which indicated Campos was a "possible consumer

---

[2] The full chronology of the booking and screening process is detailed below.

At 9:43 p.m., an officer completed a Screening Form for Suicide and Medical and Mental Impairments. Dkt. No. 76, Attach. 17 at 59.  According to that form, Campos indicated, among other things, that he had never received services for mental health or mental retardation, had never been in special education, and had never attempted suicide.  *Id.*  Furthermore, the screener did not suspect him of having any mental illness or mental retardation.  Campos was taken to Webb County Jail, where he was booked by Officer Luis Lozano around 9:53 p.m.  Dkt. No. 79, Attach.  1.  Lozano completed an intake form, which indicated that Campos reported he did not have any problems and got along "fine" with people.  Dkt. No. 76, Attach. 17 at 40.

Lozano then took Campos to the medical department for routine screening.  Dkt. No. 79, Attach. 2 at 12.  In medical, Emergency Medical Technician ("EMT") Orlando Villanueva screened Campos on April 21, 2011, at 3:00 a.m.  Dkt. No. 76, Attach. 17 at 63.  Villanueva completed an Admission Data Screening Form, in which he noted that Campos had a suicide attempt eight years before, did not have any mental illness, was not treated for mental or emotional problems, and did not check the box for "appears retarded."  Dkt. No. 76, Attach. 17 at 53.  Villanueva also noted on the Medical Chart that Campos indicated that he suffered from depression and admitted a suicide attempt by hanging eight years prior.  Villanueva then noted that he would send Campos for an evaluation with "MH Luis Macias."  Dkt. No. 76, Attach. 17 at 63; Dkt. No. 76, Attach. 8 at 1.

of MHMR,"[3] and wrote that he would schedule Campos for a meeting with mental health specialist Jose Luis Macias on the Medical Chart.  Dkt. No. 76, Attach. 17 at 63; Dkt. No. 76, Attach. 15.

Following booking, Campos was placed in holding cell J109, on the first floor. Dkt. No. 81, Attach. 4.  Officers Phillip Garza and Jose Murillo, Jr., gathered relevant documents, including Campos's criminal history, and interviewed Campos for classification.  Due to Campos's April 20 offense, he was classified as a medium offender and given a security designation of "low-medium."  Dkt. No. 76, Attach. 7 at 1 & 5. Murillo circled "N" next to override, meaning there was no reason to override the classification, and did not check any of the high risk or special conditions options, including mental or "handicap/retarded."  Dkt. No. 79, Attach. 3.   After the classification, Campos was transferred to minimum-medium cell 4P on April 21, 2011, at 6:49 a.m.  Dkt. No. 81, Attach. 5 at 12.

Several days later, mental health specialist Jose Luis Macias evaluated Campos. Dkt. No. 80, Attach. 1 at 34; Dkt. No. 76, Attach. 17 at 63.  At this evaluation, Macias followed-up on the CCQ to determine whether Campos had received any MHMR services.  Campos again indicated that he never received mental health services.  Dkt. No. 76, Attach. 17 at 63.  Macias did not call Border Region MHMR to verify this because Campos denied all symptoms and was not under any kind of distress.  Dkt. No. 80, Attach. 1 at 25.  Macias concluded that Campos did not meet the minimum criteria for further mental health evaluation.  Dkt. No. 76, Attach. 17 at 63.

Following Campos's mental health evaluation on April 25 and a tuberculosis

---

[3] MHMR stands for mental health mental retardation.

screening, medical cleared Campos to leave quarantine and enter into the general population.  Dkt. No. 79, Attach. 4 at 23, 29; Dkt. No. 76, Attach. 1 at 3.  Officer David Martinez took Campos out of quarantine and transferred him to cell 3G.  Dkt. No. 79, Attach. 4 at 21; Dkt. No. 76, Attach. 17 at 37.  According to the Webb County Jail Operations Manual, cell 3G is a maximum/medium cell.  Dkt. No. 81, Attach. 6.  However, according to deposition testimony, the cell classifications change frequently and 3G was a low-medium cell at the time Campos was moved into it, housing medium offenders.  Dkt. No. 79, Attach. 4 at 59; Dkt. No. 76, Attach. 1 at 3.  Martinez had no knowledge that cell 3G was a maximum-medium cell, and he believed it was a low-medium cell at the time.  Dkt. No. 79, Attach. 4 at 59.

On July 26, 2011, Plaintiff Mayla Campos visited Campos in Webb County Jail.  Dkt. No. 76, Attach. 12 at 6.  During the visit, Campos began to cry and mentioned that someone had tried to force himself upon him but that Campos had thwarted the effort.  Dkt. No. 76, Attach. 11 at 8–9.  Campos also gave non-verbal signs that he had been assaulted.  Dkt. No. 76, Attach. 12 at 7.

After this visit, Campos's mother became concerned that Campos had been sexually assaulted.  She first alerted a jailer on duty on July 26 immediately following the visit.  Dkt. No. 76, Attach. 12 at 7.  On July 27, she reported her concern in person to Lt. Alex Gutierrez and Capt. Ponce Trevino.  Dkt. No. 76, Attach. 1 at 3.  The content of the meeting and the content of the follow-up with Campos are in dispute.

Ms. Campos maintains that she told Gutierrez and Trevino she was concerned about her son being sexually assaulted and threatened.  Dkt. No. 76, Attach. 12 at 7.  Gutierrez has indicated that sexual assault was "never brought up" at the meeting,

Dkt. No. 82, Attach. 7 at 57, but the Incident Statement jointly prepared by Trevino and Gutierrez states that the jailers followed up on a "possible sexual assault against [Campos] by another inmate." Dkt. No. 76, Attach. 17 at 9. Ms. Campos also informed Gutierrez and Trevino that her son was borderline mentally retarded and suffered from bipolar disorder. Dkt. No. 76, Attach. 17 at 7.

Gutierrez and Trevino spoke with Campos, and they claim that he denied the rape, asked not to be moved, and wrote a Voluntary Statement indicating the same. Dkt. No. 76, Attach. 17 at 9–10.

It is undisputed that Campos signed a written statement saying "I David Campos was not sexually assaulted I was just pushed by Inmate Valasjuez I do not want to press charges. I do not want to be moved from cell G3." *See* Dkt. No. 81, Attach. 1 at 104. However, Campos maintains that he was coerced into writing the statement and that they spelled it out for him. Dkt. No. 81, Attach. 1 at 62–63.

Campos was also evaluated by Macias on that date. Dkt. No. 76, Attach. 10 at 22. However, Macias was never told about the sexual assault allegation and his report from July 27 does not indicate that any information was elicited on this point. Dkt. No. 80, Attach. 1 at 30. Campos did not report feeling afraid or any other problems to Macias during the July 27 assessment. Dkt. No. 80, Attach. 1 at 32. Campos did not receive any physical evaluation and was returned to his cell.

Campos was released from Webb County Jail on a personal recognizance bond on August 1, 2011. On August 15, 2011, Campos's mother filed a written statement reporting the sexual assault of her son, which prompted an investigation. Dkt. No. 76, Attach. 1 at 4. A few months later, Plaintiffs filed the instant lawsuit. In the Amended

Complaint, Plaintiffs allege that Defendant violated Campos's constitutional rights by failing to protect him from harm and failing to provide adequate medical care before and after the sexual assault.

## II. STANDARD OF REVIEW

### A. Conversion of Rule 12(b)(6) Motion to Rule 56 Motion

When a party moves for dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court's analysis is typically based solely on the pleadings. If, however, matters outside the pleadings are presented to the Court, the Court may treat the motion as one for summary judgment. *See* FED. R. CIV. P. 12(d) ("If, on a motion, under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56"); *see also Bowers v. Nicholson*, No. H-07-1910, 2007 WL 3047223, at *4 (S.D. Tex. Oct. 18, 2007) (construing motion to dismiss, or in the alternative, for summary judgment as motion for summary judgment where defendants attached materials outside the pleadings to the motion and plaintiff also responded with materials outside the pleadings).

If the Court chooses to construe the motion as one for summary judgment, parties must be given notice to avoid unfair surprise. *See Douglas v. State of Texas*, No. 602CV080C, 2003 WL 22861302, at *3 (N.D. Tex. Mar. 19, 2003). When a non-movant submits material outside the pleadings in response to the motion to dismiss, the non-movant is on constructive notice that the motion will be treated as one for summary judgment. *See id.* at *3.

In the instant case, Defendant's motion gave Plaintiffs actual notice that it may be treated as a motion for summary judgment because of its title.  In addition, Plaintiffs responded to Defendant's alternative motions in kind by submitting hundreds of pages of materials outside the pleadings.   Accordingly, the Court treated Defendant's alternative motions as a motion for summary judgment.[4]  *Id.*

### B. Summary Judgment Standard

Summary judgment is appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The initial burden is on the moving party to identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material when it is relevant or necessary to the ultimate conclusion of the case. *Id.*  The movant's burden is only to point out the absence of evidence supporting the non-movant's case.  *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992).

When the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party bears the burden of coming forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and citation omitted).  "The evidence of the non-movant is to be believed,

---

[4] Defendant objects to some of Plaintiffs' evidence on the basis that it is not admissible in evidence. The Court has only considered competent summary judgment evidence in reaching its conclusions.  In addition, the Court reaches the same conclusions regardless of whether it considers the disputed evidence.  Therefore, the evidentiary objections are **DENIED AS MOOT**.

and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal quotations and citations omitted). The Court must consider all of the evidence but refrain from making any credibility determinations or weighing the evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

### III.   ANALYSIS

Plaintiffs' Amended Complaint asserts violations of Campos's Eighth and Fourteenth Amendment rights.

### A. Eighth Amendment Claims

Defendant asserts that the Court should dismiss Plaintiffs' Eighth Amendment claims because the Eighth Amendment is inapplicable to pre-trial detainees.

It is well-settled law that pre-trial detainees may not bring a cause of action based on the Eighth Amendment. *See Baker v. Putnal*, 75 F.3d 190, 198–99 (5th Cir. 1996); *Thibodeaux v. Bordelon*, 740 F.2d 329, 333–34 (5th Cir. 1984). This is so because the Eighth Amendment prohibits cruel and unusual punishment, and it is impermissible to "punish" a pre-trial detainee who has not, by definition, been convicted. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996). Thus, Plaintiffs claims are properly brought under the Fourteenth Amendment due process clause. *Id.* The rights of pre-trial detainees under the due process clause are "said to be at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (internal quotation marks and citation omitted). Accordingly, the Court

dismissed Plaintiffs' Eighth Amendment claims and will now examine the claims brought under the Fourteenth Amendment.

## B. Fourteenth Amendment

### i. *Applicable Law*

Under 42 U.S.C. § 1983, plaintiffs may bring a cause of action against a person who, acting under color of state law, deprives plaintiffs of their constitutional rights. A municipality can also be liable under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

At the outset, the Court must determine whether a plaintiff alleging violations of his Fourteenth Amendment rights is challenging a condition of confinement or an "episodic act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997). Challenges to conditions of confinement involve a constitutional attack on "general conditions, practices, rules, or restrictions of pretrial confinement." *Id.* (internal quotation marks and citation omitted). The Fifth Circuit has explained that challenges to inadequate food, heating, sanitary conditions, or mail or television privileges are generally considered challenges to the conditions of confinement. *Id.* In those cases, "the conditions themselves constitute the harm." *Id.* In these cases, the Court must employ the test announced in *Bell v. Wolfish*, 441 U.S. 520 (1979), and determine whether the condition of confinement is reasonably related to a legitimate, non-punitive governmental objective. *Scott*, 114 F.3d at 53. In condition of confinement cases, the plaintiff need not demonstrate "a municipal entity's or individual jail official's actual intent to punish because . . . intent may be inferred from the decision to expose a detainee to an unconstitutional condition." *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452

(5th Cir. 2009).

However, in episodic act or omission suits, "the complained-of harm is a particular act or omission of one or more officials" and "is not amenable to review under the *Wolfish* test." *Scott*, 114 F.3d at 53. In these cases, the "actual harm" plaintiffs complain of is "an episodic event perpetrated by an actor interposed [between the plaintiff and municipality], but allegedly caused or permitted by the aforesaid general conditions." *Id.* "Because the focus of the claim is one individual's misconduct, the detainee is required to prove intent—specifically, that one or more jail officials 'acted or failed to act with deliberate indifference to the detainee's needs.'" *Shepherd*, 591 F.3d at 452 (citation omitted).

In *Scott v. Moore*, the Fifth Circuit disregarded plaintiff's characterization of the claim as a conditions of confinement claim and instead found that the harm complained of—sexual assault by a jailer—was rightly considered an episodic act or omission because "Scott did not suffer from the mere existence of the alleged inadequate staffing, but only from Moore's specific sexual assaults committed on but one occasion." *Scott*, 114 F.3d at 53. In addition, several cases in the Southern District of Texas have treated § 1983 cases involving the assault of one pre-trial detainee by another inmate as episodic acts, regardless of the plaintiff's characterization. *See, e.g.*, *Doe v. Harris Cnty.*, No. H-05-03938, 2007 WL 1217979, at *6 (S.D. Tex. Apr. 23, 2007) (finding case brought by pre-trial detainee who was sexually assaulted was properly classified as an episodic case and noting "it is difficult to imagine how this claim could be classified as a 'conditions of confinement' case."); *Brown v. Harris Cnty.*, No. H-07-0644, 2010 WL 774138, at *7 (S.D. Tex. Mar. 2, 2010) (analyzing claims for understaffing and

overcrowding that resulted in sexual assault of a pre-trial detainee as an episodic case). Thus, while the pleadings are not entirely clear and Plaintiffs' lawyers failed to elaborate on the appropriate characterization of their claims, the Court finds that this case is properly analyzed as an episodic act or omission case.

In episodic cases, the Court applies a two-step analysis to determine (1) the existence of a constitutional violation and (2) the municipality's liability for that violation. *Scott*, 114 F.3d at 54. To establish a constitutional violation in an episodic case, plaintiff must show that the act complained of was done with subjective deliberate indifference to the detainee's constitutional rights. *Id*. Subjective deliberate indifference, which is tantamount to recklessness, requires a showing that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Hare v. City of Corinth., Miss.*, 74 F.3d 633, 649 (5th Cir. 1996) (applying the *Farmer* subjective deliberate indifference standard to due process claims under the Fourteenth Amendment).

Like any other fact, subjective deliberate indifference can be established from circumstantial evidence. *See Farmer*, 511 U.S. at 842. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. However, subjective deliberate indifference is an extremely high standard that is not met by mere negligence or even gross negligence. *See Hare*, 74 F.3d at 645 ("[T]he constitutional standard of conduct [to violate the due process rights of a lawfully held detainee] must step up from negligence . . . it must be more than mere or even

gross negligence.").

Once the detainee has established subjective deliberate indifference, the "constitutional violation simpliciter," the Court must consider whether the municipality is accountable for the violation. *Id.* at 649 n.4. To succeed in holding the municipality liable, plaintiff must show the violation occurred as a result of a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights. *Id.* "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (internal quotations omitted).

### ii. Failure to Protect

Plaintiffs' theory appears to be that jailers involved in the classification of Campos knew of and disregarded a substantial risk of harm. That is, jailers knew that Campos was of borderline intelligence, misclassified him, and placed him in a cell for the general population, thus subjecting him to a substantial risk of the sexual assault that allegedly befell him.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds no issue of material fact on this claim. The evidence indicates that Campos was booked into the facility by Officer Lozano, who noted "claims to be normal" on the intake form. He was also referred to the mental health specialist, pursuant to Webb County policy, by an EMT who screened him in medical and an EMT who ran the CCQ. That same day, he was classified by Officers Murillo and Garza. They did not select any of the special categories, nor did they see any reason to override Campos's classification,

which was based solely on prior criminal history and the offense for which he was being held.  Officer Murillo has submitted an affidavit indicating that he was "not aware of any facts that would lead me to believe that placing Mr. Campos in cell 3G would cause him any harm."  Dkt. No. 76, Attach. 7 at 1.  Thus, Campos was classified as a "medium" offender with a low-medium risk assessment.

After he was classified, Campos was placed in cell 4P.  There is a dispute over the significance of this placement.  Plaintiffs argue that "4THM" on the Bookings Inquiry establishes that Campos did, indeed, have a mental health designation. While Sheriff Cuellar acknowledged that Campos had a mental health designation while he was on the fourth floor, he was not present or involved in Campos's classification.  None of the officers involved in the classification and eventual placement of Campos in cell 3G have indicated this was the case.  On the contrary, every officer involved in his classification who was asked about this has indicated he was placed in that cell awaiting final clearance from medical.  Furthermore, the "M" is not next to Campos's name; it is next to the cell.  However, in the light most favorable to Plaintiffs, Campos had an "M" designation from April 21 to April 25, and that designation meant mental health.  Still, there is no evidence that the officer who placed him in cell 3G, Officer Martinez, was aware of this.

A few days later, Macias evaluated Campos as part of the mental health screening.  With knowledge of a positive CCQ "hit" for Border MHMR, which indicated that Campos was a possible user of MHMR services, Macias queried Campos about any mental health services he received.  Campos denied receiving services for any mental health issues, and Macias accepted his answer and did not follow up.  Macias noted that

Campos did not meet the minimum criteria for further mental health evaluation.

That same day, following the mental health evaluation and based on Campos's classification as a medium offender, Officer Martinez transferred him from 4P, where Martinez believed he had been in quarantine awaiting clearance from his tuberculosis screening, to cell 3G. In Officer Martinez's deposition, he indicated that he had no knowledge that Campos had an "M" or mental health designation.  He acknowledged that mental health inmates may require special placement for their safety and testified that Campos was correctly placed in cell 3G, a general medium security cell.  Thus, there is no evidence that Officer Martinez had any knowledge about Campos's status as a mental health inmate.  Nor did Campos's mother or anyone else inform Defendant of Campos's borderline intelligence status upon intake.

Plaintiffs also seem to assert that it is obvious[5] that Campos has borderline intelligence and that his short stature makes him a likely victim of sexual assault. However, there is no evidence in the record about the obviousness of his intelligence. The only evidence before the Court indicates that the jailers did not know Campos belonged to any identifiable group.  The jailers and the mental health specialist may have been negligent in failing to probe for more information, but negligence is not sufficient to establish a constitutional violation.  Thus, the Court concludes that the jailers lacked the requisite knowledge.

### iii.  Municipal Liability

Even if Plaintiffs could show that the jailers acted with subjective deliberate

---

[5] Campos was present at a hearing held on March 31, 2014, and the Court was able to observe Campos's demeanor, appearance, and behavior.  The Court notes that there were no obvious physical manifestations of his borderline intelligence.  In addition, Campos was late to the hearing because he was parking the car for his mother.

indifference in classifying Campos and placing him in the general population, municipal liability would not be proper in this case.

"[M]unicipal liability under Section 1983 requires proof of three elements: a policymaker, an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

First, a plaintiff must show that there is a "policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). Thus, plaintiffs must identify a final policymaker who had knowledge of the policy or custom that caused the alleged violation. Plaintiffs have correctly alleged that Sheriff Cuellar is the final policymaker for the Webb County Jail. *See Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990); *see also* TEX. LOCAL GOV'T CODE § 351.041.

A policy is sufficient to warrant municipal liability even if it is an unwritten, customary practice of the county. *Webster*, 735 F.2d at 841. A plaintiff may prove the existence of a custom or policy by showing a pattern of unconstitutional conduct by municipal actors. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010). To prove a custom, a plaintiff must show a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster*, 735 F.2d at 841. For the municipality to be liable for a custom, "[a]ctual or constructive knowledge of such custom must be

attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Id.*  Furthermore, the policy or custom must be created with "deliberate indifference to its known or obvious consequences." *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 457 (5th Cir. 2000) (internal quotations and citation omitted).  Finally, Plaintiffs must establish that the county's policy or custom was the "moving force" behind the constitutional violation.  *Id.*  That is, there must be a direct causal link between the policy or custom and the alleged constitutional violation. *Id.* at 461.

In this case, Plaintiffs have failed to show a custom or policy that was promulgated with deliberate indifference to Campos's constitutional rights.   In Plaintiffs' response and at the hearing, they do not argue that Webb County's written policy for screening mentally disabled inmates is inadequate.  Rather, Plaintiffs state that the "Jail had its written rules, but then the Jail lived by and followed their ever-present practices and customs."  Dkt. No. 79 at 31.  Thus, Plaintiffs are arguing that the practices and customs of Webb County with regard to screening and classifying mentally disabled inmates violated Campos's constitutional rights.

However, Plaintiffs cannot meet their heavy burden of showing that the customs and practices rise to the level of deliberate indifference in this case.  While Plaintiffs offer evidence that the Texas Commission on Jail Standards ("TCJS") concluded that Defendant failed to complete the appropriate screening forms for all inmates immediately upon intake, there is no allegation that those screening forms were not completed for Campos.  In fact, the evidence indicates that Campos was screened, pursuant to Webb County policy, and was sent to the mental health specialist for

evaluation.  Plaintiffs may think that the evaluation itself was inadequate, and they may be correct.  Specifically, Plaintiffs have pointed to a series of recommended questions and practices for screening mentally disabled inmates. While the Court recognizes that Defendant's policy could be improved, Defendant's practices are not consistent with deliberate indifference.  Mere negligence is not enough to warrant municipal liability.  *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010).

Regardless of the TCJS report, Defendant has implemented a screening mechanism that was followed in this case.  They had an EMT screen Campos within 5 hours of intake, and they completed a CCQ report for him.  Furthermore, even though a hit on the CCQ does not necessarily indicate use of mental health services, Campos was referred for further evaluation with a mental health specialist pursuant to Defendant's policy.  That mental health specialist asked Campos whether he was a user of MHMR services and accepted his denial.

All of these practices are consistent with concern towards the eventual classification and placement of Campos for health and safety.  At no point did Campos indicate his status as an MHMR services user.  Furthermore, there have been no other reported sexual assaults in Webb County Jail from anyone in the last 28 years, much less a misclassified individual.  Thus, Defendant cannot be said to be aware of a substantial risk of sexual assault resulting from a custom of misclassification that was disregarded.

Plaintiffs assert that accepting Campos's answer that he had never received mental health services and failing to follow-up with Border Region MHMR amount to deliberate indifference.  Again, while it may be negligent to accept the answer of a

potentially mentally disabled individual when he is asked whether he received MHMR services, it does not support a finding of municipal liability.

### iv. Failure to Provide Medical Care

To show a constitutional violation of a pre-trial detainee's right to medical care, a plaintiff must satisfy the same test for the failure to protect. *See Hare*, 74 F.3d at 643 ("[W]e conclude that both medical care and failure-to-protect cases should be treated the same for purposes of measuring constitutional liability."). "That right is violated if an officer acts with deliberate indifference to a substantial risk of *serious* medical harm and *resulting injuries*." *Mace v. City of Palestine*, 333 F.3d 621, 625 (5th Cir. 2003) (emphasis added).

Plaintiffs appear to bring a claim for failure to provide adequate medical care both before and after Campos was sexually assaulted. To the extent Plaintiffs assert a claim for failure to provide appropriate mental health services to Campos before he was sexually assaulted, this claim fails for the reasons outlined above. Upon intake, Defendant had no knowledge that Campos was of borderline intelligence or had bipolar disorder, and therefore Defendant was not deliberately indifferent to his medical needs. The Court now takes up the claim regarding medical care following the allegation of sexual assault.

On July 27, 2011, Campos's mother reported a possible sexual assault to Defendant. On that day, in the light most favorable to Plaintiffs, she also informed jailers that her son was of borderline intelligence and suffered from bipolar disorder. The officers elicited a written statement from Campos, indicating he had never been sexually assaulted. They also sent him for evaluation with the mental health specialist

without informing the specialist of the allegation.  Although Defendant claims Campos denied the sexual assault and asked not to move cells, Campos has since indicated that he was coerced into writing that statement.  In the light most favorable to Campos, the Court presumes that, as of July 27, 2011, Defendant was on notice that a potential sexual assault occurred and that Campos suffered from bipolar disorder and borderline intelligence.

While the Court agrees that the investigation in this case is suspect, particularly the failure to inform the mental health specialist of the reason for the evaluation and the failure to refer Campos for a physical evaluation, the Court is not at liberty to create evidence of resulting injuries.  Plaintiffs have failed to allege the serious harm that resulted from failing to order a physical examination or a more adequate mental health examination.  While there is evidence that Campos suffered from post-traumatic stress disorder as a result of the sexual assault, there is no indication that the four days Defendant still had custody over him and did not render medical treatment worsened any mental or psychological ailment.  Plaintiffs essentially conceded this point at the hearing on March 31, 2014, stating that it would be difficult to prove harm from the delay in medical care beyond the harm from the alleged rape itself.

Even if Plaintiffs can establish a constitutional violation, they have failed to show municipal liability is proper.  Plaintiffs have not identified a county policy that is the moving force behind the inadequate medical care in this case.  Plaintiffs may be arguing that the lack of policy on interventions regarding sexual assault establishes deliberate indifference.  However, as explained fully above, Defendant had never had a single other reported incidence of sexual assault in the last 28 years.  Thus, they cannot

be deliberately indifferent to a risk of which they were not aware.

### v.  Other Theories of Municipal Liability

Plaintiffs seem to allege three other theories of municipal liability: failure to train, failure to supervise, and failure to fund.  The failure to train or supervise can be considered in the same manner.  *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).  To establish a failure to train and/or supervise, a plaintiff must show (1) the municipality's training procedures or supervision was inadequate; (2) the municipality was deliberately indifferent in adopting its training or supervision policy; and (3) those policies caused a constitutional violation.  *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010).

In order to prevail on an inadequate training claim, plaintiff must allege with specificity how a particular training program is defective.  *Id.* (citation omitted). Training that complies with state requirements is a factor that counsels against finding failure to train.  *Id.* at 171.  Furthermore, "a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation."  *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (internal quotations and citation omitted).

In the instant case, all of the jailers who assisted in the classification of Campos attended jailer school, including a part on screening mental health inmates, and had their Texas Commission of Law Enforcement Officer Standard Education ("TCLEOSE") certification, which is required by state law.  Dkt. No. 76, Attach. 1 at 4.  In addition, the mental health specialist who evaluated Campos had received trainings from Border Region MHMR and the same training at the jail academy on mental health inmates as

other jailers.  Dkt. No. 80, Attach. 1 at 8.  Such facts counsel in favor of denying liability on the basis of failure to train.  *Zarnow*, 614 F.3d at 171.  In addition, Plaintiffs do not present evidence that Defendant failed to meet the minimum training requirements or that the state requirement was inadequate in light of the jailer's duties.  *Benavides v. County of Wilson*, 955 F.2d 968, 973–74 (5th Cir. 1992).

Furthermore, even if the training or supervision[6] were inadequate, Plaintiffs have failed to show deliberate indifference.  There is no evidence of a pattern of misclassifying mental health inmates, and there is no indication that it is "obvious" the training or supervision the jailers have received is inadequate or obviously likely to lead to a sexual assault.

As for the failure to fund, the Plaintiffs conceded at the hearing that the failure to fund claim is linked to the failure to train and supervise.  To the extent it is a failure to fund training or supervision, the Court finds no deliberate indifference as explained above.

### C. State Law Claims

In what appears to be an abundance of caution, Defendant moves for dismissal of all state law claims because Plaintiffs have failed to allege any of the facts that support waiver of sovereign immunity under Texas Tort Claims Act § 101.021(2).  Dkt. No. 76 at 14.  The Court has carefully reviewed the entire Amended Complaint and does not agree that Plaintiffs have alleged any state law claims.  Furthermore, Plaintiffs acknowledged at the hearing that they were not asserting any state law claims.  Thus, the Court finds there are no state law claims and cannot dismiss non-existent claims.

---

[6] The Court agrees with Defendant that the Amended Complaint is devoid of information related to the failure to supervise. But even assuming there is a claim regarding failure to supervise, the Court finds that whatever supervision that lacks falls far short of deliberate indifference.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 76) has been **GRANTED**.  Plaintiffs' suit is hereby **DISMISSED WITH PREJUDICE**.

As no claims remain, the Clerk of the Court is hereby directed to **CLOSE** this case.

It is so **ORDERED**.

**SIGNED** this 3rd day of April, 2014.

Marina Garcia Marmolejo
United States District Judge